

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

September 9, 2020

**BY ECF**
The Honorable John F. Keenan
United States District Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, New York 10007

Re:  United States v. Milesh Talreja, 20 Cr. 233 (JFK)

Dear Judge Keenan:

The Government submits this letter in advance of the September 14, 2020 sentencing of the defendant, Milesh Talreja. The defendant, who twice absconded following his guilty plea in this case and remains a fugitive today, can be sentenced *in absentia* pursuant to Federal Rule of Criminal Procedure 43(c)(1)(B). The Government believes that the applicable sentencing range under the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") is a term of imprisonment of 37 to 46 months. For the reasons set forth below, the Government respectfully submits that a term of imprisonment within this range is sufficient but not greater than necessary to serve the purposes of sentencing.

The Government also respectfully requests the Court enter the attached restitution order for the unrecovered losses to the victim in the amount of $116,692.73. On August 21, 2020, the Government requested defense counsel's position on the proposed restitution order but has not yet received a response.

**I. The Defendant's Offense Conduct**

The defendant was born in 1990 in Australia and is a citizen of that country. (Presentence Investigation Report revised June 26, 2020 ("PSR") ¶ 37). Beginning in 2007, the defendant amassed ten convictions in Australia for fraud related offenses resulting in terms of imprisonment, probation, and home detention. (PSR ¶ 33). Not long later, the defendant took his fraud overseas. In 2018, the defendant was convicted of fraud in the United Kingdom and was sentenced to a term of imprisonment. (PSR ¶ 34). He was then extradited to France for a fraud charge there. (PSR ¶ 34).

[redacted]



Approximately one month after he was granted entry into the United States, the defendant committed the instant bank fraud. On November 7, 2019, the defendant walked into a bank branch ("Bank-1") in Manhattan, New York, and told a Bank-1 employee ▮ He showed the employee a fake U.S. Government check written out to him, but claimed he did not want to deposit the Government check. Instead, the defendant wrote and deposited a personal $500,000 check into his checking account at Bank-1. (PSR ¶ 8). The check was drawn on an account held by the defendant at a different bank ("Bank-2"), which at the time contained only $5,608.99. (PSR ¶ 9). In accordance with Bank-1's practices, a portion of the deposited funds was made available to the defendant pending the clearing of his check. The next day, the defendant made a series of withdrawals, including the following: (1) a $100,000 transfer to another bank account held by the defendant at Bank-1; (2) a $5,000 wire transfer to Bank-2; (3) three international wire transfers totaling $30,261.47; (4) two checks totaling $7,500; and (5) an ATM withdrawal of approximately $100. (PSR ¶ 11). Over the next few days, the defendant continued to make additional withdrawals. (PSR ¶ 12). Bank-1 ultimately suffered an unrecovered loss of $116,692.73.

On February 5, 2020, the defendant was arrested and ordered detained.[3] On February 26, 2020, the defendant participated in a proffer session with the Government in an effort to obtain leniency with respect to his prosecution. The Government evaluated the information provided by the defendant as incomplete and untruthful in material respects.

On March 26, 2020, the defendant pleaded guilty before Magistrate Judge Cave to a criminal information charging one count of bank fraud. (*See* Plea Transcript ("Tr."), ECF Doc. No. 16-1). At his plea hearing, the defendant admitted that he "wrote a check for half a million dollars from my account at [Bank-2], even though I only had a few thousand dollars in that account," and subsequently "transferred $100,000 of the money to my savings account at [Bank-1]. And from there I transferred $30,000 to my family, withdrew $50,000, and wrote two checks totaling $7,500." (Tr. 13). The defendant claimed that he "always believed that the $500,000 check would bounce," and "was surprised when I looked at my account the following day and saw

---

[1] 

[3] During the execution of his arrest, the defendant had a scuffle with the arresting agents that left a cut on his left eyebrow. The defendant did not request medical treatment.

that [Bank-1] had allowed access to the funds." (Tr. 13). The defendant admitted, however, that when he deposited the check, he was seeking a credit card that would allow him to spend money. (Tr. 16). The defendant further admitted that when he withdrew the funds, he knew the funds were drawn from the check he had deposited and that he expected not to clear. (Tr. 16). On April 7, 2020, this Court accepted the defendant's plea.

## II. The Defendant's Bail Violations and Flight

On March 26, 2020, the defendant requested, with the consent of the Government, bail pending sentencing. Judge Cave granted the defendant bail on the following conditions, among others: (1) a $100,000 bond co-signed by two financially responsible persons, (2) surrender all travel documents, (3) restrict travel to the Southern and Eastern Districts of New York, and (4) report as directed to Pretrial Services. On March 27, 2020, Pretrial Services spoke by telephone with the defendant, who acknowledged the conditions of his release and was instructed to report weekly by telephone. On April 2, 2020, defense counsel advised the Government that the defendant would mail his Australian passport that day to Pretrial Services.

On April 30, 2020, this Court held a telephonic bail review conference because the defendant had neither mailed his Australian passport to Pretrial Services nor made any contact with Pretrial Services since March 27, 2020. Defense counsel, but not the defendant, appeared on the call. At the conference, the Court instructed that a bench warrant would issue unless the defendant contacted Pretrial Services by 3:00 p.m. that day, in which case the defendant would be subject to the additional condition of standalone GPS location monitoring. Promptly after the conference,[4] the defendant contacted Pretrial Services and advised that he was in Philadelphia, Pennsylvania. The defendant reported to Pretrial Services the next day, surrendered his Australian passport, and was issued a GPS ankle monitor. The Government thereafter consented to the defendant's requests to modify his bail conditions to remove the co-signer requirement and to permit him to travel to the District of New Jersey so that he could find new housing there.

On June 21, 2020, the defendant removed his GPS ankle monitor and, for the second time, absconded. That same day, defense counsel advised the Government that the defendant had sent an email stating he had left the country.[5] On June 22, 2020, this Court issued a bench warrant for the defendant's arrest.

On August 13, 2020, the defendant sent an email to the Government stating, among other things: "I am now in China and will not make myself available to US Authorities. . . . There is no point attempting to trace this email. It sits behind multiple layers of encryption, and as I have stated, I am in in China where there is no Extradition to the United States. As a Hong Kong

---

[4] The timing of the defendant's call to Pretrial Services strongly suggests that he had been monitoring the telephonic bail review conference without disclosing his participation.

[5] ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

Permanent Resident with a claim to Chinese Nationality, I have no intention of departing the PRC and am immune from deportation."[6]

On August 25, 2020, the Court issued an order that, among other things, directed the defendant to appear in person for his sentencing on September 14, 2020. *See* Order, ECF Doc. No. 37.

### III. The Defendant May Be Sentenced *in Absentia*

Should the defendant fail to appear in person as directed for his sentencing on September 14, 2020, the Court may sentence him *in absentia*. Federal Rule of Criminal Procedure 43(c)(1)(B) provides that a defendant who has "pleaded guilty . . . waives the right to be present . . . in a noncapital case, when the defendant is voluntarily absent during sentencing." As the advisory committee notes to the 1995 amendments indicate, Rule 43 now "make[s] clear that a defendant who, initially present at trial or who has entered a plea of guilty or nolo contendere, but who voluntarily flees before sentencing, may nonetheless be sentenced in absentia." *See United States v. Jacobs*, 201 F.3d 433 (2d Cir. 1999) (unpublished disposition) ("As amended in 1995, Rule 43(b)(2) of the Federal Rules of Criminal Procedure permits a District Court to sentence *in absentia* when a defendant who has pled guilty is voluntarily absent from sentencing."); *cf. United States v. Arrous*, 320 F.3d 355, 360 (2d Cir. 2003) (defendant's absence at resentencing was "at least partially involuntary" because the defendant had been deported following his incarceration).

In this case, the defendant's own words and actions make plain that any decision to absent himself from the sentencing proceedings would be voluntary. As an initial matter, there is no doubt that the defendant has notice of the sentencing date: The Court set the current sentencing date of September 14, 2020 on June 17, 2020 — *i.e.*, four days before the defendant fled — and then expressly directed the defendant to appear in-person in an order dated August 25, 2020. *See* Orders, ECF Doc. Nos. 29, 37. The defendant, through his attorneys, is on notice of the Court's docketed orders. *See generally In re Sanchez*, 790 F. App'x 293, 296 (2d Cir. 2019) (summary order). Indeed, the defendant's efforts to circumvent his counsel and contact the Court directly concerning another case, *see* Order, ECF Doc. No. 35, strongly suggest that he is personally monitoring the docket. In all events, should the Court wish to confirm the defendant personally received notice of the sentencing date through his attorneys, the Court may inquire, at the sentencing, as to defense counsel's efforts to contact the defendant.

The record is equally clear that the defendant's decision to abscond and remain a fugitive is voluntary. The defendant has fled the jurisdiction not once but twice while on bail — first in April 2020, when he falsely claimed to be surrendering his passport and instead disappeared to Philadelphia, and then in June 2020, when he removed the GPS ankle bracelet that the Court had

---

[6] The defendant subsequently sent numerous additional emails to the Government and made one phone call to the undersigned. The Government has repeatedly informed the defendant that it can communicate only with his counsel of record regarding his case, and has forwarded the defendant's communications to defense counsel. On September 9, 2020, the defendant called a New York City Police Department liaison to Australia and engaged in an extended discussion. The Government promptly notified defense counsel.

ordered as a consequence of his earlier violation. On the day that he removed his ankle bracelet, the defendant told his counsel that he had left the country. And in the months since, he has declared in his own words that he "will not make myself available to US Authorities," that he is "in China where there is no Extradition to the United States," and that he has "no intention of departing the PRC." The defendant's own words and actions thus confirm that he intends to be "voluntarily absent during sentencing." Accordingly, the Court may sentence the defendant *in absentia* if he fails to appear in the courtroom as directed on September 14, 2020.

## IV. Applicable Guidelines Range

The defendant pleaded guilty to a one-count information charging him with bank fraud, in violation of 18 U.S.C. §§ 1344 and 2. That offense carries a maximum term of imprisonment of 30 years, a maximum term of supervised release of 5 years, a maximum fine pursuant to Title 18, United States Code, 3571, of the greatest of $1,000,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to persons other than the defendant resulting from the offense, and a $100 mandatory special assessment.

Pursuant to U.S.S.G. § 1B1.11, the Probation Office calculated a total offense level of 16 — incorporating a 12-point enhancement for the intended loss of $500,000 and a 3-point reduction for acceptance of responsibility — and a criminal history category of I, with a resulting Guidelines range of 21 to 27 months' imprisonment. (PSR ¶¶ 18–32, 58). Because the defendant has absconded and made false statements while on bail, the Government believes the defendant should receive a 2-point enhancement for obstruction of justice, and should not receive a 3-point reduction for acceptance of responsibility. Accordingly, the Government respectfully submits that the defendant's total offense level is 21, his criminal history category is I, and the resulting Guidelines range is a term of imprisonment of 37 to 46 months.[7]

---

[7] The Government did not object to the Guidelines calculation in the presentence report, which was initially prepared on May 29, 2020. Pursuant to Federal Rule of Criminal Procedure 32(f)(1), objections were due June 12, 2020 — *i.e.*, before the defendant fled. Accordingly, the Government was not aware of the defendant's flight at the time that objections were due. Moreover, the defendant made his false representations ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ as recently as September 4, 2020. The Government therefore has "good cause" to make "a new objection . . . before sentence is imposed." Fed. R. Crim. P. 32(i)(1)(D). Even if the Government did not have good cause for a late objection, the Court has "an independent duty to calculate the Guidelines range," *United States v. Rendsland*, 648 F. App'x 104, 107 (2d Cir. 2016) (summary order), and "may impose sentencing enhancements belatedly suggested by the Government and not contained in the PSR, provided the defendant is afforded an adequate opportunity to respond to the Government's late submission and any revision of the PSR," *United States v. Young*, 140 F.3d 453, 457 (2d Cir. 1998) (citation omitted). If the defendant wishes to contest the adjustments suggested by the Government, he may do so at his sentencing or in supplemental papers in advance.

A. **The Defendant Obstructed Justice**

U.S.S.G. § 3C1.1 provides for a 2-level increase in the offense level if "(1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense."

The defendant's flight on bail pending sentencing — as well as his false representation that ███████████████████████████████████████████ — is a paradigmatic example of obstruction of justice. Application note 4(E) to U.S.S.G. § 3C1.1 specifically lists, as a type of conduct to which the enhancement applies, "escaping or attempting to escape from custody before trial or sentencing; or willfully failing to appear, as ordered, for a judicial proceeding." The Court may find that the defendant's flight is "willful" for the same reasons that the Court may sentence him *in absentia* — *i.e.*, because his words and actions prove that his disappearance is voluntary. Indeed, should the defendant fail to appear in person at sentencing as directed, the Court may conclude that his intentional failure to appear "is so inherently obstructive of the administration of justice that it is sufficient that the defendant willfully engaged in the underlying conduct, regardless of [his] specific purpose." *United States v. Sonia Rivera*, 28 F. App'x 55, 58 (2d Cir. 2002) (summary order) (affirming obstruction-of-justice enhancement where defendant "absconded just prior to the time she was to be sentenced and . . . deliberately absented herself" from sentencing); *see also United States v. Zuber*, 118 F.3d 101, 105 (2d Cir. 1997) (affirming "decisions to both to increase the defendant's offense level for obstruction of justice and to deny the defendant's motion for an acceptance of responsibility departure" because "the defendant had fled the jurisdiction twice" (internal quotation marks and brackets omitted)).

B. **The Defendant Has Not Accepted Responsibility**

Application Note 4 to U.S.S.G. § 3E1.1 provides that "[c]onduct resulting in an enhancement under § 3C1.1 (Obstructing or Impeding the Administration of Justice) ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct." Accordingly, for the same reasons that the defendant has obstructed justice — *i.e.*, by absconding twice, by making false representations as to the reasons for his flight, and by remaining a fugitive — he has not accepted responsibility for his offense conduct. *See Gonzalez v. United States*, No. 00 Cr. 54-2 (JFK), 2012 WL 3583161, at *2 (S.D.N.Y. Aug. 21, 2012) (no acceptance-of-responsibility reduction where defendant absconded for nine years and had received an obstruction-of-justice enhancement); *Zuber*, 118 F.3d at 105 (affirming both obstruction-of-justice enhancement and denial of acceptance-of-responsibility departure where the defendant fled twice).

C. **The Defendant Intended a Loss of $500,000**

Application Note 3 to U.S.S.G. § 2B1.1 instructs that "[s]ubject to the exclusions in subdivision (D), loss is the greater of actual loss or intended loss." Intended loss "(I) means the pecuniary harm that the defendant purposely sought to inflict; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur . . . ." U.S.S.G. § 2B1.1 app. n. 3(A)(ii).

Actual loss, by contrast, "means the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1 app. n. 3(A)(i).

In his objections to the PSR, the defendant contends that he should not receive a 12-point enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(G) because he did not intend a loss of $500,000. The defendant argues that he could not have intended this loss because he wrote a $500,000 check "in order to obtain a credit card from [Bank-1] — fully expecting that the check to his own account would never clear." The defendant argues he should therefore be held responsible only for the actual loss amount of $116,692.73, which would result in an 8-point enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(E).

A review of the defendant's own assertions confirm he intended a loss of $500,000. The defendant claims that he provided Bank-1 with a $500,000 check in order to convince the bank to issue him a credit card. In effect, the $500,000 deposit would serve as informal collateral on the line of credit on the credit card. While Bank-1 ultimately extended credit to the defendant not in the form of a credit card but rather as funds available in his deposit account, the Court may make the straightforward inference that the defendant intended to obtain credit from Bank-1 in the amount of his purported deposit — *i.e.*, $500,000. Put differently, given the defendant presented a $500,000 check in order to induce Bank-1 to issue him a credit card, the Court can and should infer that the defendant intended to fraudulently obtain, and use, a credit card with a limit of $500,000. *See United States v. Sowels*, 998 F.2d 249, 250–51 (5th Cir. 1993) (affirming loss amount of $351,600 based upon the aggregate credit limit on 110 stolen credit cards, even though only $28,540.89 in unauthorized charges were identified).

[text redacted]

---

8 [text redacted]



## V. A Guidelines Sentence of 37 to 46 Months' Imprisonment Is Warranted

The Government respectfully requests that the Court impose a term of imprisonment within the Guidelines range of 37 to 46 months' imprisonment. The defendant has spent his entire adult life committing fraud, and the instant conviction is the defendant's twelfth across three continents. After being charged in this case, the defendant repeatedly abused the trust of both the Government and the Court, and he remains a fugitive today. A Guidelines sentence is warranted by the nature and circumstances of the offense and by the history and characteristics of the defendant, and is necessary to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence, and to protect the public from the further crimes of the defendant. *See* 18 U.S.C. § 3553(a).

*Nature and Circumstances of the Offense*. The defendant committed a brazen $500,000 check fraud that resulted in unrecovered losses of nearly $120,000. To lull the bank, the defendant presented a fake U.S. Government check. After then depositing a personal check that he knew was drawn on insufficient funds, the defendant made a barrage of transfers, including an internal bank transfer, a domestic wire, multiple international wires, and multiple checks, to get the money out. The sophistication of this scheme, which is in keeping with the defendant's extensive history of fraud, weighs in favor of a meaningful term of imprisonment.

*History and Characteristics of the Defendant*. Since 2007 (when he was 17 years old), the defendant has accumulated ten convictions in Australia, one conviction in the United Kingdom, an extradition to France, and now the instant conviction in the United States. This extensive criminal history merits particular consideration given the defendant's Guidelines calculation considers only his prior convictions in the United States — *i.e.*, none. That substantially understates the length and severity of the defendant's criminal record, which makes clear that the instant bank fraud is not an exception for the defendant but is rather his norm. *See* U.S.S.G. § 4A1.2(h) ("Sentences resulting from foreign convictions are not counted, but may be considered under § 4A1.3 (Departures Based on Inadequacy of Criminal History Category (Policy Statement)).").

It is true that the defendant's history also includes ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. But the defendant did not use that work as a chance to turn a new page but as a vehicle to commit yet more fraud. Scarcely one month after being paroled into the country, the defendant breached the Government's trust by committing the instant bank fraud. When given the opportunity to explain his actions and accept responsibility at a proffer, the defendant again breached the Government's trust by providing information that was incomplete and untruthful. After the Government consented to the defendant being bailed — despite an immigration detainer that would have otherwise resulted in his transfer into immigration custody

— the defendant absconded to Philadelphia. After the Government agreed to lift the defendant's bail condition of two co-signers for his $100,000 bond, the defendant absconded for a second time. The defendant's history of fraud and unrelenting abuse of the Government's trust weighs heavily in favor of a meaningful term of imprisonment.

*Need to Promote Respect for the Law.* The defendant abused not only the trust of the Government, but also the trust of the Court. While on bail, the defendant:

- Failed to report to Pretrial Services for more than a month
- Falsely claimed that he would be mailing his Australian passport to Pretrial Services
- Absconded to Philadelphia
- Removed his GPS ankle bracelet and absconded again
- Falsely claimed ▮
- Falsely claimed ▮
- Remains a fugitive

The defendant's wholesale disregard for the conditions of his bail — even after being permitted to remain at liberty after absconding the first time — evince no respect for the law, Pretrial Services, or the Court. *Cf. United States v. Schroeder*, 288 F. App'x 746, 748 (2d Cir. 2008) (summary order) ("the court did not err in finding the breach of trust inherent in any failure to surrender offense to be more serious here, where it followed on the heels of notably lenient treatment."). The need to promote respect for the law thus weighs heavily in favor of a meaningful term of imprisonment.

*Need to Provide Just Punishment and Afford Adequate Deterrence.* The defendant's six-figure bank fraud, standing alone, would warrant a meaningful term of imprisonment both as a matter of just punishment and in order to maintain general deterrence. When taken in combination with his extensive history of fraud and complete disregard for the Court's trust while on bail, however, the defendant's offense conduct plainly requires a significant term of imprisonment in order to specifically deter him from committing future crimes.

*Need to Protect the Public.* For similar reasons, a meaningful term of imprisonment is necessary to protect the public from future financial crimes by the defendant. The defendant's history of fraud and conduct while on bail virtually assure that if given the opportunity, the defendant will commit financial crimes yet again. *Cf. United States v. Gibson*, 173 F.3d 847 (2d Cir. 1999) (summary order) (defendant who "had an extensive history of fraud" and who "admitt[ed] participation in a fraudulent check cashing scheme while on supervised release . . . presented an unusually high danger of recidivism").

For the foregoing reasons, the Government respectfully requests that the Court impose a term of imprisonment within the Guidelines range of 37 to 46 months' imprisonment and enter the proposed restitution order attached hereto.

Respectfully submitted,

AUDREY STRAUSS
Acting United States Attorney for the
Southern District of New York

By: _____
Alexander Li
Assistant United States Attorney
(212) 637-2265

cc: Ilene Jaroslaw, Esq. (*by ECF*)
    Alisha McCarthy, Esq. (*by ECF*)