

485 Lexington Avenue
New York, NY 10017-2643
212.977.9700
Fax 212.262.5152

New York • New Jersey

Ilene Jaroslaw
(212) 841-1343
ijaroslaw@phillipsnizer.com

www.phillipsnizer.com

**REQUESTED TO BE
FILED UNDER SEAL**

September 9, 2020

The Honorable John F. Keenan
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

    Re:    <u>United States v. Milesh Talreja</u>, 20 Cr. 233 (JFK)

Dear Judge Keenan:

    This letter is submitted to respectfully request that the Court sentence defendant Milesh Talreja to time served, a sentence that is within the applicable United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range. If the Court endorses a Guidelines calculation different from the calculation set forth herein, we respectfully move the Court for a variance based on Mr. Talreja's mental health, the horrific and unwarranted conditions of his arrest and detention, and his months-long assistance to the government. This matter is scheduled for sentencing before Your Honor on September 14 at 11:30 a.m.

    We begin by examining the full context in which Mr. Talreja converted bank funds to his own use and addressing Mr. Talreja's mental illness as it bears on the offense conduct. Next, we calculate Mr. Talreja's offense level under the Guidelines, which turns on his subjective intent in committing the crime. We then describe an assault on Mr. Talreja at the time of his arrest and the harrowing conditions he experienced at the MCC. Finally, we relay information about Mr. Talreja from friends and family. In sum, Mr. Talreja has been sufficiently punished for his offense and imposing additional prison time would be grossly disproportionate, cruel, and unjust.

I.    <u>The Offense In Context</u>

    Context is everything, especially in evaluating intent. When Mr. Talreja walked into a Chase Bank branch on November 7, 2019, his only objective was to obtain a credit card, not to steal money. That objective, however, was complicated by Mr. Talreja's status as a foreign national with no credit history in this country and no reliable source of income. *See infra.* He was informed by bank personnel on site that obtaining a credit card would require a substantial



amount of funds on deposit with the bank – and that is when Mr .Talreja wrote a check on the spot, in <u>purple highlighter</u>, for $500,000.

Mr. Talreja never imagined the check would clear, and he certainly did not believe Chase would give him immediate access to the funds. He was clear about this in his plea allocution: "I always believed the $500,000 check would bounce. I was surprised when I looked at my account the following day and saw that Chase had allowed access to the funds." Transcript of Plea Proceeding before U.S. Magistrate Judge Sarah L. Cave on March 26, 2020 ("Tr.") at 13, lines 17-20. *See also* Tr. at 14, lines 19-21 ("I only had the intention of depositing that check to be granted a credit card by JPMorgan Chase.") and Tr. at 15, lines 3-8 ("It was quite a shock to see a half-a-million-dollar check clear.")

When Mr. Talreja discovered on November 8 that his check had cleared and the funds were unexpectedly credited to his Chase account, he was in shock. He was also in the midst of a manic episode that was a manifestation of his bipolar disorder.[1] Mr. Talreja has a long history of mental illness and has been on medication almost entirely from 2006 to the present. In 2007, he was hospitalized in Australia for depression, by court order, and was released after three weeks on the condition that he abide by his medication treatment plan prescribed by a psychiatrist. Mr. Talreja has since made two suicide attempts; the markings of one of the attempts (scars on his left wrist) are documented on his booking sheet.

Mr. Talreja transferred a portion of the credited funds out of that Chase account over the next few days – and then he stopped. Mr. Talreja never intended, or attempted, to take $500,000 from Chase.



---

[1] As noted in the PSR, Mr. Talreja was diagnosed with bipolar disorder and depression in 2006. "Bipolar disorder, formerly called manic depression, is a mental health condition that causes extreme mood swings that include emotional highs (mania or hypomania) and lows (depression)." https://www.mayoclinic.org/diseases-conditions/bipolar-disorder/symptoms-causes/syc-20355955. "These mood swings can affect sleep, energy, activity, judgment, behavior and the ability to think clearly." *Id*.

[2] Redacted

[Redacted] Mr. Talreja depended on his father to finance his living expenses. With some of that money, Mr. Talreja opened checking accounts in New York and applied for a credit card for daily use.

Because Mr. Talreja was experiencing a bout of uncontrolled mania when the funds appeared in his account, he succumbed to his impulses.[3] The temptation was too great for him to resist: the temptation not so much to enrich himself but to repay his father who had been supporting him over the years. *See* Exhibit A, Letter of Suresh D. Mehta. We highlight Mr. Talreja's use of proceeds not to excuse the crime, but to provide some insight into his impulses that led him to this day.

In short, Mr. Talreja could have converted the entire $500,000 that cleared into his checking account but he did not and never intended to do so. Mr. Talreja is responsible for converting the $116,692.73, but he had no criminal intent with respect to the rest.

II.     The Court Should Sentence Mr. Talreja To Time Served Under The Guidelines

We concur with the Presentence Report (PSR) that the calculation of Mr. Talreja's offense level is governed by U.S.S.G. § 2B1.1, with a base offense level of 7 under § 2B1.1(a). However, we dispute the PSR's application of the Specific Offense Characteristic pertaining to the amount of loss caused or intended by the commission of the offense, under U.S.S.G. § 2B1.1(b)(1). In determining the amount of loss that was intended here, the Court should consider Mr. Talreja's subjective intent in light of all the facts and circumstances discussed below. Mr. Talreja's adjusted offense level falls within Zone C of the Sentencing Table, authorizing a Guidelines sentence of time served.

It is undisputed by the government that the actual loss to Chase Bank was $116,692.73. This amount is reflected in the Order of Forfeiture, issued upon the government's motion. *See* Doc. No. 18. This actual loss amount, which is between $95,000 and $150,000 warrants an upward adjustment of 8 levels under U.S.S.G. § 2B1.1(b)(1)(E).

The actual loss in this case is also Mr. Talreja's intended loss. The government's position, and the calculation set forth in the PSR, is that the intended loss was $500,000, requiring an upward adjustment of 12 levels under U.S.S.G. § 2B1.1(b)(1)(G). That position would require the government to establish, by a preponderance of the evidence, that Mr. Talreja intended to convert $500,000. Not only is there is no such evidence, but all available evidence points to the contrary. *See supra* Section I.

---

[3] That the offense is at least in part attributable to his mental health condition is supported by the sheer lack of logic behind the offense. [Redacted] [Redacted] – and no rational bank patron would reasonably expect a bank to honor a check for a half million dollars written on the spot in purple highlighter by someone in their late 20s.

      Accordingly, Mr. Talreja's offense level under the Guidelines is 15: a base offense level of 7 plus a loss adjustment of 8 levels under U.S.S.G. § 2B1.1 (b)(1)(E). With a two-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(A), the applicable Guidelines offense level is 13. Given Mr. Talreja's criminal history category of I, the applicable Guidelines range is 12 to 18 months. Mr. Talreja's offense level falls within Zone C of the Sentencing Table. He is, therefore, eligible for a Guidelines sentence of time served (7 weeks and one day of incarceration) together with a term of supervised release. U.S.S.G. § 5C1.1(d)(2).

III.    <u>The Court Should Grant a Variance and Sentence Mr. Talreja To Time Served</u>

[Redacted]

      However, in December 2019, he crashed. Mr. Talreja was hospitalized in New York; his entire body shut down. When he was released, he abandoned end-of-year plans he had to travel to California. He spent Christmas and New Year's Eve and all the days in between alone and unable to get out of bed [Redacted]. He had no income and was perpetually worried about money. [Redacted]

[Redacted]

[Redacted]




Instead, on the morning of February 5, a team of agents burst into Mr. Talreja's apartment at dawn.[4] Mr. Talreja had been sleeping and put up no resistance. That did not stop one of the agents from brutally bashing him against a wall of the apartment. A photo of Mr. Talreja on the day of his arrest after the blood was cleaned off his face has been provided to the defense.[5] The large gash and dried blood above Mr. Talreja's eye is readily apparent. *See* Photo, Exhibit B. One of the arresting agents also took cell phone photos of Mr. Talreja while he was still bloodied up. We asked the government for these photos but they have not been provided to us.[6] Now, over seven months later, Mr. Talreja bears a permanent scar above his eye where he sustained the injury. He also bears psychological scars from his violent arrest at the hands of the same government he had spent months working for at great personal risk.

It is not hyperbole to describe the 50 days Mr. Talreja spent at the MCC as cruel and unusual punishment. On several occasions in early February, the undersigned counsel were turned away from visiting Mr. Talreja after waiting many hours to see him. We were able to see our client at the MCC only once. In late February, the MCC instituted a two-week lockdown of Mr. Talreja's unit because an inmate – residing in the same unit as Mr. Talreja – was found in possession of a firearm and had been contracted to murder Mr. Talreja's cellmate, the former second-in-command of the Sinaloa Cartel, who was a star witness in the "El Chapo" trial, *United States v. Guzman-Loerra*, 09 Cr. 616 (S-4) (BMC) (E.D.N.Y.). Mr. Talreja was petrified.

---

[4] [Redacted] told Mr. Talreja, "We could have arrested you in California but deliberately waited for you to come back to New York because you have less chance of bond here . . . . If you're stupid enough to apply for bail today, you're going straight to ICE custody" and "**We federalized this** because we can be sure that ICE will get you from here, not like those sanctuary f***ers in New York State."

[5] Detective McCaffrey told Mr. Talreja, "If you want to get your eye looked at, we have to go to Bellevue, and that means you won't be arraigned today and probably won't get bailed."

[6] [Redacted]

During the lockdown that followed the discovery of the firearm, Mr. Talreja endured nine days with no hot food. Frozen baloney and bread were served twice daily. Following those nine days was a week of one "hot" meal that was cold by the time it was brought to the unit, plus one frozen meat meal. For six days of the lockdown, Mr. Talreja had no access to his property: it was mid-winter and he was handed only a single thin blanket. He was so cold he was shivering, and he could not sleep. Mr. Talreja begged for more blankets. He was refused.

The indignities during the lockdown were relentless. Mr. Talreja was denied toilet paper for two days and resorted to using newspaper. For the first seven days of the lockdown, no showers were allowed. A shower was finally allowed on day 8 – and only for two minutes at 3:30 a.m. in freezing cold water with no privacy and at gunpoint by masked CERT team members. Shower curtains were removed for "security."

During and after the lockdown, Mr. Talreja could not access his prison email, including email from counsel. He had access to the commissary for only two of his 50 days at the MCC.

Mr. Talreja was experiencing suicidal ideations and was given access to a psychologist exactly once. The psychologist took down Mr. Talreja's name and promised to return, but never did. The MCC denied Mr. Talreja any prescription medication, despite our having requested a medication order from U.S. Magistrate Judge Sarah L. Cave at Mr. Talreja's initial appearance on February 5.

Mr. Talreja was also subjected to racist and ethnic slurs and abuse by corrections officers in the prison. One called him a "sand nigger." Another one, asking Mr. Talreja's name, told him, "If you don't spell your name right, I'll come in that cell and beat the f*** out of you, you terrorist f****er." The latter epithet was particularly devastating because several members of Mr. Talreja's family were killed by terrorists in India, in the 26/11 Mumbai Blasts which took place in November 2008. Mr. Talreja was disturbed and upset to hear a corrections officer insult the memory of his beloved family members who lost their lives at the Taj Mahal Palace Hotel on November 26, 2008.

On a different occasion, Mr. Talreja was taken barefoot through the prison despite the danger of contracting HIV or Hepatitis C from needles and broken glass on the floor. When Mr. Talreja asked for shoes, a CERT team officer placed what appeared to be a paintball or rubber bullet gun flush against Mr. Talreja's temple and shouted, "Shut the f*** up, you don't have the right to s***."

Mr. Talreja saw inmates injecting heroin and methamphetamine intravenously on a near daily basis. On one occasion, an inmate smoked K2 and passed out. Mr. Talreja gave CPR to the inmate and poured milk down his throat to revive him while calling for help. When Officer Capiello arrived at the scene, he said to Mr. Talreja, "It's just more K2, f*** it, who cares if he dies, you've got this, haven't you Miles? I'm going back to the bubble."

On another occasion, Mr. Talreja told the Warden, Marti Licon-Vitale, that a corrections officer was smuggling heroin into the MCC. Warden Licon-Vitale asked whether it was "Canetta." Mr. Talreja told her that it was a different corrections officer, whereupon she lost all interest and said she would return to speak more about it, but never did. Inmates routinely showed Mr. Talreja weapons, drugs, cell phones, and other contraband they bought from corrections officers and orderlies at the MCC.

Gangs (the "Bloods" and "Trinitarios") controlled access to the telephone for non-legal calls and intimidated prisoners who wanted to use the phone. The gangs threated prisoners with being "slashed with surgical scalpels" if they tried to use the phone without the gangs' permission. Mr. Talreja witnessed several assaults, including stabbings. The gangs "allowed" Mr. Talreja to make only two calls to his family during his time at the MCC. Mr. Talreja had to walk on eggshells around the gangs to survive at the MCC as inmates self-sorted by ethnicity. Mr. Talreja's complicated ethnicity, as a dark-skinned person of Indian and Yugoslavian descent, with a distinct Australian accent, meant that he had to navigate the prison social dynamics without natural allies.

Even Mr. Talreja's legal calls were restricted by the staff. His requests to call the undersigned were frequently and routinely ignored, and only once was he able to call us from the MCC.

Mr. Talreja asked more than 40 times to call the Australian Consulate in New York but was denied, in breach of the Vienna Convention on Consular Relations. Mr. Talreja raised the matter with Warden Licon-Vitale who acknowledged that "we have to facilitate that call." Notwithstanding her acknowledgement, there was no follow up. Mr. Talreja was not permitted to contact the Consulate until the day before his scheduled guilty plea and release from the MCC.

Shortly after the unit's lockdown was lifted, COVID-19 restrictions went into place. Many inmates on Mr. Talreja's unit were visibly ill but not treated or separated from the general prison population. Mr. Talreja witnessed one sick inmate coughing and with a high fever. This inmate asked for "sick call" multiple times at the start of the pandemic and was never attended to. No personal protective equipment, masks, or cleaning supplies were provided for any inmates at the MCC during Mr. Talreja's incarceration. At the MCC, Mr. Talreja was refused all medication[7] he had been prescribed as treatment for his bipolar condition. As a result, he decompensated severely. He was in a seven-week sleep-deprived state of terror, fearing he would not emerge from prison alive. He felt betrayed by the government he had worked with so hard for. Mr. Talreja was adrift in a foreign country, cut off from the outside, surrounded by menacing, violent criminals. For a person in such a fragile mental and emotional condition to withstand this trauma is unimaginable. To have experienced it for passing an obviously bad check is a Kafkaesque level of absurd.

---

[7] Redacted

Mr. Talreja's flight from the United States was not rational or lawful but is understandable. He re-entered a different New York than the one he had left, as COVID-19 was overwhelming the local hospitals and residents sheltered in place. His untreated bipolar disease was unmanaged and he believed that government agents were out to get him. He could not bear the thought of returning to the MCC, or being remanded to Immigration and Customs Enforcement ("ICE") custody after what he had been through and with the rapid spread of COVID-19 in the prison system. [Redacted]

IV.     The Ends of Justice Will Be Met By A Sentence of Time Served

For all the reasons set forth above, a sentence of "time served," whether fashioned as a Guidelines sentence in Zone C or a variance, is fair and just. The punishment that Mr. Talreja already endured for a writing a bad check and converting just over $100,000 from a large federally-insured bank during a manic episode is more than sufficient.

Sentencing Mr. Talreja to additional jail time for his bank fraud offense is completely unwarranted, notwithstanding his flight. Sentencing Mr. Talreja to time served comports with the mandate of 18 U.S.C. § 3553(a) that courts impose a sentence "sufficient, but not greater than necessary, to comply with the purposes" of sentencing under § 3553(a)(1), including the nature and circumstances of the offense, the history and characteristics of this defendant.

The Court is about to sentence a man who risked his life to help our country. In the experience of those who have known him for years, Mr. Talreja is brilliant, resourceful, loyal, sensitive, warm, and funny.[8] Mr. Talreja neither denies nor minimizes the crime he committed. At the same time, he has paid mightily. We implore Your Honor to impose a just sentence, a sentence proportionate to the offense. We respectfully submit that the fair and just sentence in this case is time served.

Respectfully submitted,

Ilene Jaroslaw
Alisha McCarthy

---

[8] *See* Letters of Simon McGuinness, Exhibit C; Eliza McGrath, Exhibit D; Suresh Mehta, Exhibit A.