

485 Lexington Avenue
New York, NY 10017-2643
212.977.9700
Fax 212.262.5152

New York • New Jersey

www.phillipsnizer.com

Ilene Jaroslaw
(212) 841-1343
ijaroslaw@phillipsnizer.com

**REQUESTED TO BE
FILED UNDER SEAL**

September 15, 2020

The Honorable John F. Keenan
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

Re:  <u>United States v. Milesh Talreja</u>, 20 Cr. 233 (JFK)

Dear Judge Keenan:

This letter is submitted in response to the government's sentencing memorandum of September 9 (the "Memo"). In its Memo, the government seeks a sentence within a much higher Sentencing Guidelines range than it had previously agreed was appropriate in this case. Moreover, the Memo contains unsupported accusations and misleading inferences that cannot be left unchallenged in the record. The sentencing has been adjourned to Wednesday, September 16 at 11:00 a.m.

In this response, we first address some of the inaccuracies and misleading suggestions in the Memo, including how the Memo's characterization of the offense of conviction is contradicted by the government's representations to the Court at the April 30 conference. We then holistically address the twin issues of Mr. Talreja's acceptance of responsibility for this offense and his liability, if any, for obstructing justice. In short, the unique circumstances of this case in their totality weigh against imposing additional punishment on Mr. Talreja.

I.  <u>Correcting the Record: Inaccurate and Misleading Assertions in the Memo</u>

- The government is accurate in stating that Mr. Talreja was extradited to France for a fraud charge. (Memo p. 1). However, the Memo omits the salient fact that



- Mr. Talreja was released two hours after arriving in France, and was permitted to depart France the following day.

- The government states that Mr. Talreja ███Redacted███. (Memo p. 2). This is false. Mr. Talreja neither said nor implied any such thing, and this is the first we have heard of this contention (from the government or otherwise).

- The government suggests that Chase Bank acted "in accordance with . . . [its] practices" in releasing the funds to Mr. Talreja upon depositing the $500,000 check. (Memo p. 2). However, this is not consistent with either (i) the common knowledge of anyone who has ever deposited a check with a major bank, or (ii) Chase Bank's own guidelines. *See* https://www.chase.com/content/dam/chasecom/en/checking/documents/deposit_account_agreement.pdf, p. 17.

- 

- It is troubling to see the treatment of Mr. Talreja at his arrest characterized as having "a scuffle with the arresting agents." (Memo p. 2). The arrest was conducted by well over a dozen law enforcement officers who rousted Mr. Talreja from bed and hit his face against the wall before throwing him down on the floor and arresting him. It was a stunning show of force, and there was no credible basis for the agents to believe that Mr. Talreja would resist arrest.[1]

- We are perplexed by the government's assertion that, on April 30, Mr. Talreja was secretly "monitoring the telephonic bail review conference without disclosing his participation." (Memo p. 3 n. 4). The government bases this suspicion on the

---

[1] Mr. Talreja does not dispute he has been previously arrested, several times. Not once has it ever been suggested he resisted arrest in any jurisdiction.

"timing of the defendant's call to Pretrial Services." *Id*. However, the timing of events that followed the conference are completely consistent with the Court's order at the conference, based on Mr. Talreja's failure to appear:

THE COURT: All right. So if you hear from him, Ms. Jaroslaw, he is to immediately contact Mr. Bostic -- not in a half hour, not in ten minutes, but immediately, as soon as he gets off the phone from you or the e-mail from you. Do you understand that?

MS. JAROSLAW: I do, your Honor. And I will impress that upon my client.

Transcript of April 30, 2020 Status Conference, Doc. 23 p. 12.

Fortunately, we were able to reach Mr. Talreja shortly after the conference. He had just woken up and was hysterical that he had slept through the Court conference. Mr. Talreja immediately called Pretrial Services and the next day reported in person to surrender his Australian passport as directed. We do not understand why the government would infer from that sequence of events that Mr. Talreja was secretly listening in on the conference (or what Mr. Talreja would even theoretically have to gain by doing so).

- [Redacted] Mr. Talreja's representations on this matter cannot reasonably be construed as obstruction of justice.

- It is surprising to see the government refer to the "sophistication of this scheme" in describing the offense. (Memo p. 8). As we noted in our submission on September 9, the offense was anything but sophisticated. Indeed, the sheer lack of logic shows that the offense was at least in part attributable to Mr. Talreja's mental health condition. [Redacted] no rational bank patron would reasonably expect a bank to honor a check for a half million dollars written on the spot in purple highlighter by someone in their late 20s.

II. The Characterization of the Offense and Intended Loss In The Memo Is At Odds With The Government's In-Court Statements

The government asserts in its Memo that Mr. Talreja "intended a loss of $500,000" and argues that "the Court can and should infer that the defendant intended to fraudulently obtain, and use, a credit card with a limit of $500,000." Memo p. 7.

In court, however, the government characterized the offense as, "in essence, [ ] a bad check." Transcript of April 30, 2020 Status Conference, Doc. 23 p. 10. Mr. Talreja never attempted to receive a credit line in the amount of $500,000:[2] In fact, Mr. Talreja told the Chase account manager that he would be content with a credit limit as little as $1,000 provided he could transfer funds from his existing Chase checking account to the card when the card balance approached its limit. The figure of $500,000 came into play when the account manager handed Mr. Talreja an application for Chase Private Client and upsold him to the Chase Reserve card, which required a $500,000 minimum monthly balance.[3]

> MR. LI: . . . In essence what happened is, the defendant walked into a JPMorgan Chase Bank branch. He presented a check that was written out for the amount of $500,000.
>
> THE COURT: 500,000.
>
> MR. LI: Yes, your Honor. A $500,000 check drawn on an account that he held at Bank of America. The check, according to the defendant, he intended to -- his **purpose in presenting this check was to get a credit card or multiple credit cards from JPMorgan Chase, and they wanted to see that he had funds in his bank account before they would extend him credit.**
>
> . . .

---

[2] Indeed, there is no evidence that Chase Bank ever gave (or considered giving) Mr. Talreja a credit card with such an extraordinary credit limit. At no time was a $500,000 credit limit requested or even discussed.

[3] Mr. Talreja had initially offered to write a check for $150,000 before he was told $500,000 was required to obtain a Chase Reserve credit card.

> [The Bank of America account] only had a few thousand dollars. And the check eventually bounced. Before it bounced, however, JPMorgan extended -- they made available to him, in his deposit account, more than a hundred thousand dollars, which he promptly transferred into other bank accounts and withdrew. All told, he was able to take out about $120,000, even though the check ultimately bounced and was not able to recover really any money from that source, Bank of America.
>
> THE COURT: And he pleaded guilty.
>
> MR. LI: And he pleaded guilty. **So, in essence, this is a bad check.**
>
> THE COURT: Thank you very much.

*Id*. pp. 9-10 (emphases added).

III. <u>Mr. Talreja Accepted Responsibility for His Offense and Does Not Deserve An Enhancement For Obstruction Of Justice</u>

Before Mr. Talreja left the jurisdiction, the government did not dispute that Mr. Talreja merited a downward adjustment in his Guidelines calculation for acceptance of responsibility. Mr. Talreja pleaded guilty to the offense, and not in connection with any plea agreement – he simply admitted the crime and made no excuses for it. [Redacted] Certainly, nothing in Mr. Talreja's pre-flight conduct would warrant an upward adjustment to his Guidelines calculation.

With respect to Mr. Talreja's fugitive status, we have recounted for the Court Mr. Talreja's state of mind at the time of his flight. He felt betrayed by the government; he feared for his safety; and he was overcome by his bipolar disorder (which had gone completely untreated during his time at the MCC).

Moreover, we remain far from certain that Mr. Talreja acted alone in fleeing the jurisdiction. Redacted

Redacted

The Court is now familiar with the events between February and June 2020, from the brutality of Mr. Talreja's arrest, to his dystopic seven weeks at the MCC, through Mr. Talreja's release on bond. Mr. Talreja was fitted with an ankle bracelet on May 1, which was found to have been cut off on the morning of June 21.

It is not clear to us how Mr. Talreja could have fled the jurisdiction without some kind of assistance. Mr. Talreja's every movement was monitored by Pretrial Services between May 1 and June 21. He left his apartment only to go to the local pharmacy and market. He never left his neighborhood. And on the morning of June 21, when Mr. Talreja escaped, New York was still in lockdown (Phase 1) due to the COVID-19 pandemic. International flights from the United States were few. Borders were closed. Mr. Talreja had no passport.

Between March 26, the date of his release, and April 30, the date of the Court's status conference, Mr. Talreja was in possession of his Australian passport and had no GPS ankle bracelet. Had he fled at that time, departing the United States would have been relatively simple. Yet it was not until several weeks *after* he surrendered his passport, *after* he was fitted with an ankle bracelet, Redacted, that Mr. Talreja left the United States.

Redacted Given Mr. Talreja's experience at the MCC, the resulting fears and nightmares that now haunt him, and his mental and emotional vulnerability, he may have felt he had no choice.



If that inference is correct, ███████████ Redacted ███████████
███████████████████████████████████████ it would be fundamentally unfair to augment Mr. Talreja's Guidelines calculation by two levels for obstruction of justice under U.S.S.G. § 3C1.1. Likewise, it would be unjust not to grant Mr. Talreja the agreed-upon decrease in his adjusted offense level for acceptance of responsibility under U.S.S.G. § 3E1.1(a).

For all the reasons stated above and in our letter of September 9, we respectfully reiterate our plea to impose a sentence proportionate to the crime of conviction and accounting for the conditions Mr. Talreja endured at the MCC. We respectfully ask for the Court's compassion and mercy, and for a sentence of time served.

Respectfully submitted,

Ilene Jaroslaw
Alisha McCarthy

cc: AUSA Alexander Li
  *via e-mail*