K9GTTALS – REDACTED

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4          v.                          20 CR 233 (JFK)

5  MILESH TALREJA,

6              Defendant.

7  ------------------------------x
                                   New York, N.Y.
8                                  September 16, 2020
                                   10:55 a.m.
9
   Before:
10
                    HON. JOHN F. KEENAN,
11
                                       District Judge
12
                         APPEARANCES
13
   AUDREY STRAUSS
14      Acting United States Attorney for the
        Southern District of New York
15 ALEXANDER LI

16 PHILLIPS NIZER
        Attorneys for Defendant
17 BY:  ILENE JAROSLAW

18

19

20

21

22

23

24

25

1          (Defendant not present)

2          THE COURT:  This is in the matter of the United States

3     versus Milesh Talreja.  The reason we're here is for sentence

4     in absentia, and we're going to proceed under Rule 43(c)(1)(B),

5     and that permits the Court to sentence in absentia when counsel

6     are present in court and if counsel wants that done, and the

7     government certainly does.  But before we ever get to that, I

8     want to say something else.

9          And I don't think I said good morning to you.  Good

10     morning, Mr. Li.

11          MR. LI:  Good morning, your Honor.

12          THE COURT:  Good morning, Ms. Jaroslaw.

13          MS. JAROSLAW:  Good morning.

14          THE COURT:  Good morning to both of you.

15          And the first thing I want to take up is in your

16     August 24 letter, Ms. Jaroslaw, on the second page you say to

17     me, "Second, Mr. Talreja has failed to pay any amount of the

18     outstanding fees owed by him in exchange for our services to

19     this point, and we have no meaningful assurance that payment

20     will be forthcoming."

21          I think that you're understating your position there.

22     It doesn't seem to me there's any likelihood, if he absconded,

23     that he's going to pay you.  Maybe he will, but that would

24     astound me.  You then go on to say, "This has placed me and my

25     firm in a challenging position.  Therefore, I am compelled to

1   respectfully move the Court for payment under Criminal Justice

2   Act 18, United States Code, 3006(a)."

3          Frankly, I am very much inclined to grant that

4   application, but what I do need from you is an affidavit as to

5   your work on the case, and I guess a very brief memorandum of

6   law as to why you're entitled to it under the CJA.  If you can

7   get me that by next Wednesday, I would appreciate it.

8          Does the government object to their receiving

9   compensation?

10          MR. LI:  No objection, your Honor.

11          THE COURT:  If there's no objection, if you give it to

12   me -- well, could you get it to me by next Tuesday?  If that's

13   too soon --

14          MS. JAROSLAW:  Your Honor, Wednesday would be best.

15          THE COURT:  Why don't you drop your mask while you're

16   talking.  It's very difficult to hear with the mask on.

17          What did you say, I'm sorry?

18          MS. JAROSLAW:  If it's possible to submit Wednesday

19   rather than Tuesday.

20          THE COURT:  All right, sure, sure.

21          MS. JAROSLAW:  Thank you very much, your Honor.

22          THE COURT:  That's fine.  As I say, I'm very much

23   inclined to grant the application, but I do think I should get

24   an affidavit and a formal motion.

25          MS. JAROSLAW:  Yes, of course, your Honor.

1          THE COURT:  Thank you very much.

2          So as I said, this is for sentence, and first I will

3    hear the defense, and that's Ms. Jaroslaw, and I have your

4    written submissions.  And frankly, that's one of the reasons

5    that I'm very much inclined to grant your motion to receive CJA

6    payment because you certainly put work into the submissions,

7    there's no doubt about it.  That doesn't say how I'm going to

8    rule, but I say you put work into it and they're very well

9    done, so that's why I have said that I am inclined to grant it.

10          I said I have your submissions, I was looking for

11   them.  We have the September 9 submission, then there was a

12   reply submission to the government's memorandum, and that's

13   September 15.  I have obviously read both of your submissions,

14   and you go right ahead and tell me anything else that you want

15   to tell me.

16          MR. LI:  Your Honor, if I may, before proceeding --

17          THE COURT:  I will give you an opportunity to be

18   heard.

19          MR. LI:  Just as a threshold matter, before proceeding

20   to the substance of the sentencing, we would ask the Court to

21   make the finding that the defendant is voluntarily not present.

22   That is a required finding before proceeding in absentia.

23          THE COURT:  Well, he certainly isn't.  I look around

24   the courtroom, the only people in the courtroom are

25   Ms. Jaroslaw, you, my deputy, the very able court reporter, and

1    my law clerk and me.  So he's not here, he's not present.  I

2    make the finding that he's absent.  I have issued a warrant for

3    his arrest and I have found, I think, that he's absconded, and

4    if I didn't formally find that, I find that he absconded.

5           I had intended and still will read into the record

6    concerning his failure to be here what he has to say in his

7    August 13 email to the government.  He wrote on August 13 in an

8    email addressed to the government, I'm quoting from the email,

9    "I am now in China" -- I don't know whether that's true -- "and

10   will not make myself available to U.S. authorities.  There is

11   no point attempting to trace this email.  It sits behind

12   multiple layers of encryption and, as I have stated, I am

13   in" -- he writes "in" twice -- "I am in in China where there is

14   no extradition to the United States.  As a Hong Kong permanent

15   resident with a claim to Chinese nationality, I have no

16   intention of departing the PRC" -- which I take to mean the

17   People's Republic of China -- "and am immune from deportation."

18          So I make the finding that he's not here and therefore

19   we can proceed under Rule 43(c)(1)(B).

20          Anything else before I hear from Ms. Jaroslaw?

21          MR. LI:  Just to clarify, your Honor, not only is the

22   defendant not here, but that he is voluntarily not here.

23          THE COURT:  I think the email speaks for itself, but

24   if I'm required to make that finding, I find that it's

25   voluntary, his non-appearance.

1          MR. LI:  Thank you, your Honor.

2          THE COURT:  Thank you for bringing that to my

3     attention.

4          Ms. Jaroslaw.

5          MS. JAROSLAW:  Thank you, your Honor.  I think the

6     salient facts that happened here really aren't in dispute.

7     There is some dispute as to Mr. Talreja's motivation, but he

8     was seeking a credit card, he wrote a bad check in purple

9     highlighter for half a million dollars.  Much to his surprise,

10    he didn't only get the credit card but the deposit cleared very

11    rapidly, the next day.  And I can cite Chase's own policies

12    that show that that's actually not in conformity with Chase's

13    policy for new accounts or deposits over $5,000.

14         Mr. Talreja converted $116,000 of that money, and it

15    was wrong, and from the moment he was picked up he admitted it

16    was wrong.  He pled guilty with no plea agreement.  He

17    attempted to continue cooperation that he had been doing for

18    the DEA for approximately eight months.  He was incarcerated

19    under extraordinarily difficult conditions.  I don't need to

20    recount those now, I think I went into that in great detail in

21    the letter.  He suffered greatly.

22         There's no real dispute that my client suffers from

23    bipolar disease, and I have copies of some of the prescriptions

24    if the Court wishes to see that.  He takes a great deal of

25    medication for this bipolar disease.  He had to go cold turkey

1    on the medication, which can actually be very dangerous, when

2    he was at the MCC.  He was terrified.  He was frightened.  He

3    was in a situation with a lockdown where he didn't have enough

4    blankets or other clothing to keep warm or enough food to eat.

5    He was thankfully released on March 26.  He was out on bail for

6    a period of time, and subsequent to being fitted with a GPS

7    monitor, he escaped.  There's no question that these things

8    happened, there's no question as to the salient facts, although

9    we disagree on some of the details.

10         If Mr. Talreja simply pled guilty, I submit to the

11   Court there may not even be a dispute with the government as to

12   whether a sentence of time served would be warranted.  It was

13   not just 50 days at the MCC, it was under very difficult

14   conditions under the circumstances.

15         But we do have a situation where he did escape, and as

16   I write in my letters, I think particularly as lawyers, as a

17   judge, we make inferences in this courtroom all the time.  And

18   it's worth noting that Mr. Talreja, in addition to having

19   bipolar disease, is brilliant and actually has legal training

20   in Australia.  He speaks nine languages.  It's undisputed that

21   he has a history of working with intelligence agencies in the

22   past.

23         THE COURT:  That's all very interesting, intelligence

24   agencies, because I did that when I was in the service.  I was

25   in an intelligence agency.  That's before either of you were

1  born.  That was in the Far East.  But I could prove that, I

2  have documents that show that.  He says he was in intelligence.

3  His whole background -- he's got ten convictions, doesn't he,

4  in Great Britain, in the United Kingdom?

5       MS. JAROSLAW:  I don't believe it's ten convictions,

6  but there's no dispute that he has a history of fraud; no

7  history of violence or drug crimes, but yes, he does have a

8  history of fraud.

9       THE COURT:  Right.  And under the guidelines, I'm

10  permitted to take that into consideration, although it doesn't

11  add points as it would if they were American convictions,

12  right?

13       MS. JAROSLAW:  Correct, your Honor.  It's a basis

14  potentially for an upward departure in the criminal history

15  categories.

16       THE COURT:  I'm not really thinking about a departure,

17  I'm thinking about the appropriate level here, because all bets

18  are off because he absconded.  I mean he stopped cooperating.

19  I read from his email he's not going to cooperate, he's not

20  going to appear, and if he was in intelligence, for which

21  countries?  What did he do?  I don't want to give away any

22  national secrets, but all this stuff about intelligence doesn't

23  really mean a lot to me in this case.

24       MS. JAROSLAW:  Your Honor, I can be specific, but I

25  would ask then that the transcript be sealed.

1          THE COURT:  Oh, no, the application to seal anything

2    here is denied.  I didn't rule on it.

3          You asked for that, didn't you --

4          MS. JAROSLAW:  Yes.

5          THE COURT:  -- before?  And no, I say all bets are

6    off.  The reason I was going to permit things to be sealed was

7    because of his cooperation.  He's not cooperating.  Nothing is

8    sealed.

9          MS. JAROSLAW:  Your Honor, I'm in a difficult position

10   because I have information regarding even an operation as

11   recently as the last couple of days, but without sealing,

12   Mr. Talreja would be in danger if it were in the public

13   transcript, so I will have to decline.

14         THE COURT:  I'll accept the fact that he did some work

15   for some government or governments in foreign intelligence, but

16   so far as I know, he never did anything for the American

17   government.

18         MS. JAROSLAW:  Well, actually, that's not true, he

19   worked with the DEA since April 2019 on operations --

20         THE COURT:  Who?

21         MS. JAROSLAW:  Mr. Talreja worked with the DEA since

22   April 2019.

23         THE COURT:  Is the DEA an intelligence agency?

24         MS. JAROSLAW:  He was introduced to the DEA by an

25   intelligence agency, and I don't think Mr. Li would dispute

1    that.

2                THE COURT:  All right.  Go ahead.

3                MS. JAROSLAW:  And he did work on operations with the

4    DEA overseas traveling hundreds of thousands of miles with the

5    DEA.  The tangible case he worked on here in the Southern

6    District of New York is he made I believe a number of

7    recordings allowing the arrest of the defendant in ██████

8    ████████████████████  which is before Judge Cote at the present

9    time.

10               THE COURT:  I know about Judge Cote's case.  I have

11   spoken to her at length about this a couple of times.

12               MS. JAROSLAW:  I see.  I guess we get to the point, as

13   I said, where one has to make inferences.  If Mr. Talreja were

14   of the mindset to abscond, the perfect time would have been

15   right after the April 30 conference when your Honor was

16   understandably not pleased at Mr. Talreja's failure to appear.

17               THE COURT:  You mean the Philadelphia thing?

18               MS. JAROSLAW:  Yes, although I believe the DEA

19   provided information to Mr. Li that in fact Mr. Talreja was in

20   California at the time.  I don't know if he was in California

21   or Philadelphia, but my inference, based on the fact that we

22   called him at approximately 1:30 New York time and we woke him

23   up suggests to me he may well have been in California.

24               THE COURT:  But he said he was in Philadelphia, fine.

25               MS. JAROSLAW:  Yes.  Again, a rational person who was

1  inclined to flee had every opportunity then.  He had his

2  passport, he had no GPS monitor.  Whether he was in California

3  or Philadelphia, it would have been a relatively simple matter

4  to leave the United States.  Instead, he returned the following

5  day, as instructed by the Court, surrendered his passport, got

6  fitted for a GPS monitor, then the question is:  How?  How and

7  why would my client flee on June 21st?

8         The "why" certainly makes no sense because, your

9  Honor, this is, at bottom, a bad check, a successful bad check

10  where a defendant converted $116,000.  He had a number of

11  factors that were mitigating, and with due respect, I think I

12  could have made a very strong, perhaps ultimately persuasive

13  argument for time served at the time.  And I advised him that

14  he was in a good position, vis-a-vis sentencing, not to worry.

15         So why did he leave and how did he leave?  And again,

16  your Honor, I submit that it's not -- it doesn't make sense

17  that he could do this on his own.  Keep in mind that he has had

18  these ties with law enforcement and intelligence.  He had to

19  have been helped.  He could not have cut the bracelet and

20  successfully left the United States without help.  There's no

21  other possible explanation than him having help.  The GPS

22  monitor showed that between May 1st and June 21st, Mr. Talreja

23  never left his neighborhood.  He never went beyond his

24  pharmacy.  He never went beyond the market.  He didn't go into

25  Flushing to get a fake passport, he didn't meet with people

1    uptown to get fake ID, he stayed in his neighborhood.  So how

2    could he possibly leave without assistance?

3         And the fact that he so brazenly calls Mr. Li, the

4    fact that he reaches out to me on a regular basis, provides me

5    with information, that seemed to be corroborated by news

6    reports, of things that he's involved in, it doesn't make

7    sense.  If he were on his own, one would expect him, perhaps,

8    to hide in a basement in Alberta, Canada, not to be poking the

9    bear and contacting Mr. Li and inserting himself in Judge

10   Cote's case.  He would only do that if he felt secure and safe

11   enough to do that.  And how could he feel secure and safe

12   enough to do some of the things he's doing without the

13   protection of some government entity or entities?

14        THE COURT:  Assume that what you say is right.  I'm

15   not accepting it necessarily, but assume it.  So what?  He's

16   still under the jurisdiction of this Court and he absconded.

17        MS. JAROSLAW:  Absolutely.  And that's an affront to

18   this Court.

19        THE COURT:  I couldn't care if he's working for the

20   Queen of England, the Prime Minister of Australia, the Prime

21   Minister of New Zealand or the Prime Minister of Canada.

22        MS. JAROSLAW:  All of which are possibilities.

23        THE COURT:  I couldn't care if he was working for the

24   DEA, he's under the jurisdiction of this Court, not some

25   foreign intelligence agency or even the DEA.

1          MS. JAROSLAW:  Yes, your Honor, it's absolutely an

2     affront to this Court.  It's an affront to your Honor.  It's an

3     affront to the justice system --

4          THE COURT:  To you, too.

5          MS. JAROSLAW:  -- to a defense attorney who did not

6     tell him to pursue this path, to the government.  It is an

7     affront, and I do not deny that, and I would go so far to say

8     that my client would not deny it.  It's truly an affront to

9     this Court.  I don't minimize it.  I was in Mr. Li's chair for

10    many years.  I take this Court seriously and I don't approve of

11    the course of action.  I make that clear.  However, how should

12    the Court handle that, assuming it's true -- and I understand

13    your Honor does not necessarily accept it as true -- but

14    assuming it is true, the question is:  What are the

15    consequences of that fact?

16         The question is:  Who was responsible for Mr. Talreja

17    affronting this Court, ignoring the orders to appear when he

18    was supposed to appear?  And I would submit that he's

19    ultimately not responsible, and it's an issue at the level of

20    the State Department and at the level of our intelligence

21    agencies.

22         But Mr. Talreja is a pawn caught between different

23    governments.  And given his experience at the MCC -- and I

24    provide the Court with genuine detail.  And I was there myself

25    before the lockdown.  It was a terrifying experience for

1  Mr. Talreja, made all the worse by his mental condition.  Given

2  the consequences of coming back here, where perhaps I would

3  have been successful in getting time served, but then perhaps

4  he would be put in ICE custody -- and he was equally terrified

5  of ICE custody -- or a government or governments offering him a

6  path to safety, to what he viewed as safety, it's not what I

7  would recommend, I condemn the choice, but it's not an

8  irrational choice for which he should be held responsible in

9  the United States.  It's perhaps a diplomatic issue.

10         But the crime that he committed and the crime he was

11  charged with and pled guilty to with no conditions, he has paid

12  for that crime.  He has spent hard, hard time at the MCC and

13  been traumatized by it, which I submit was a huge factor in his

14  ultimate weighing of what his best course was.  And I don't

15  think the punishment in a case for a bad check should reflect

16  the difficult Catch-22 choice he found himself in.

17         Mr. Talreja means to do well, and he has made

18  mistakes, and he will be the first to admit that.  He is trying

19  to accomplish something in his mind; and again, he experiences

20  mania, he experiences periods of depression.  In his mind, he

21  is making a positive contribution to the world.  Again, not the

22  path I would recommend at this time, I would have recommended

23  he get sentenced first and then pursue that path, but this is

24  what he's chosen out of genuine, well-founded fear.  And I

25  think mercy is warranted here because this isn't a case of

K9GTTALS - REDACTED

1  someone who was granted bail from the start.  He was seriously

2  punished for seven-plus weeks, and I submit that's sufficient

3  for passing a bad check.

4          The Court will enter an order of restitution, and

5  that's entirely appropriate, and the Court can enter a sentence

6  of time served with supervised release.  And your Honor, should

7  he return to the United States and be arrested, your Honor can

8  then see him face to face and see whether any additional time

9  is warranted.  And I submit that there's no purpose in this

10  courtroom, there's absolutely no purpose to be served by

11  imposing some sentence of imprisonment.  I don't see how that

12  satisfies any of the ends of justice or any of the ends for

13  which sentencing is appropriate.

14          THE COURT:  Anything else?

15          MS. JAROSLAW:  No, your Honor, unless there are any

16  questions.

17          THE COURT:  I should have asked and I didn't ask, it's

18  obvious from your letters, did you read the probation report?

19          MS. JAROSLAW:  Yes, I read the probation report, your

20  Honor.

21          THE COURT:  And are you ready for sentence?

22          MS. JAROSLAW:  Yes, I'm ready for sentence.  And

23  having spoken to Mr. Talreja, he was ready to be sentenced in

24  absentia.

25          THE COURT:  The objections to the report which are

1    listed, I am ruling with the probation department, not in your

2    favor on any of those objections.  I can't ask whether the

3    defendant read it of the defendant because he's not here.

4              So go ahead, Mr. Li.

5              MR. LI:  Thank you, your Honor.  I would like to start

6    with something the defense counsel said in discussing

7    potentially how and why the defendant fled in June.  She

8    suggested that if in fact he received assistance from a foreign

9    government or foreign intelligence agency, then ultimately he

10   would not be responsible for his own flight.  I think that

11   statement really cuts to the heart of two of the issues before

12   the Court, which is whether the defendant has really taken

13   responsibility for his actions and whether he abides by the

14   rule of law.

15             I think that statement is very revealing.  Even if the

16   defendant received what I might call a better offer to go

17   somewhere else with the assistance of a foreign government or a

18   foreign intelligence agency or whoever, that does not excuse

19   him violating the orders of this Court or taking it upon

20   himself to decide that he will no longer be subject to this

21   Court's order or sentencing.  He is responsible for his flight.

22   There's no suggestion that he was somehow kidnapped or taken

23   away without his consent.  At most, the defense is suggesting

24   that he might have received help from somebody in leaving.

25   That's not an excuse.  That does not absolve him of

1  responsibility.

2         THE COURT:  There's no evidence of that.

3         MR. LI:  And there's no evidence of that, that's

4  exactly right.

5         THE COURT:  That's pure speculation.

6         MR. LI:  Not only, your Honor, is it pure speculation,

7  but the government in fact contacted the intelligence agency

8  that the defense had proffered and that intelligence agency

9  denied that they assisted or facilitated his escape.  So no,

10  there is no factual basis at all for this suggestion.

11         But I want to go back to acceptance of responsibility

12  and the nature and characteristics of the defendant.

13         THE COURT:  You're repeating what's in your letter.

14         MR. LI:  Yes, your Honor, and I don't mean to repeat.

15  I do want to point out a couple of things, actually, in the

16  defendant's submission that I think are revealing.  The Court

17  noted earlier that this is not the defendant's first

18  conviction, that, in fact, he has sustained ten convictions.

19         THE COURT:  I misspoke, I said in the United Kingdom,

20  I should have said Australia.  He has ten convictions in

21  Australia, not in the United Kingdom.  I think he had one more

22  in the United Kingdom.

23         MR. LI:  That's correct, your Honor.

24         THE COURT:  I misspoke earlier, go ahead.

25         MR. LI:  But one thing I think that's revealing about

1    the defendant's submission is that the defendant includes a, I

2    think, really powerful and heartfelt letter from his father.

3    In that letter from the father he writes about the defendant's

4    fraud that he had conducted in Australia, and he notes that the

5    fraud in Australia was really directed at his father.  He sort

6    of suggests -- I don't think he says it explicitly, but he

7    suggests that essentially the defendant had stolen from his own

8    father.  And the father also goes on to say that he used the

9    proceeds of this fraud to fund what he called a six-month jaunt

10   around the world.

11         I think what this tells your Honor is that contrary to

12   the defendant's suggestion that his conduct here was some sort

13   of one-time act in a fit of a manic episode, in fact this is

14   conduct completely in accord with his prior conduct, conduct

15   that even his own family agrees was done for greed so that he

16   could fund a lifestyle that allowed him to travel for six

17   months across the world.

18         I don't intend to repeat my sentencing submission,

19   your Honor.  I do want to say one word about the defendant's

20   submission, which is the defendant, in addition to sort of

21   deflecting responsibility on this foreign intelligence agency,

22   also attributes various, I'll just call it thuggish actions and

23   statements by the government attorneys and agencies.  This is

24   false, it's unequivocally false.  But you don't have to just

25   take my word for it, you can look at what the government has

1   actually done in this case and every single courtesy, great and

2   small, that the government has extended to the defendant.

3            The government could have arrested the defendant when

4   he was in Hawaii in January.  The government said wait until he

5   comes back from his trip and arrested him in New York.  The

6   government could have denied him an opportunity to proffer, not

7   let him speak and try to take responsibility.  The government

8   gave him that opportunity.  The government could not have

9   agreed to bail in March.  The government did, in fact, consent

10  to bail.  The government could have insisted that he then go

11  into ICE detention because he is not lawfully in the United

12  States.  In fact, at the request of the defense attorney, the

13  defendant's attorney, we reached essentially an agreement with

14  ICE that the defendant would not be taken into ICE custody

15  pending his sentencing.

16           The government could have insisted after he fled the

17  first time to Philadelphia that he then be detained.  The

18  government did not insist on that, and the Court in fact

19  allowed the defendant to remain on bail.  After the defendant

20  couldn't get co-defendants, the government consented yet again

21  to modifying his bail conditions so that he would not have to

22  get cosigners for his $100,000 bond.  The government in this

23  case has extended to the defendant every courtesy, great and

24  small, and there is simply nothing to substantiate that the

25  government has somehow abused him or taken thuggish actions or

K9GTTALS - REDACTED

1  made thuggish statements towards him.

2       I'm prepared to answer any questions that the Court

3  may have, but otherwise I rely on our sentencing submission,

4  including our request for the enhancements stated in our brief

5  and our request for a restitution order attached to our

6  sentencing submission.

7       THE COURT:  Can you tell me something that is so

8  secret that it can't be divulged, what intelligence agency of

9  which nation did you contact?

10       MR. LI:  Sure, I will tell the Court.  I may ask at

11  the close of this and after discussing with defense counsel

12  that certain portions of the transcript be redacted, especially

13  if we talk about --

14       THE COURT:  Just tell me the country and redact that.

15       MR. LI:  Sure.  ██████████████████, the relevant

16  intelligence --

17       THE COURT:  All right.  It's redacted as to which

18  country he allegedly served in gathering intelligence, that's

19  stricken.  Not stricken, but redacted.

20       Okay, fine.  Anything else?

21       MR. LI:  Nothing further, your Honor.

22       THE COURT:  Okay.  Anything in rebuttal, briefly?

23       MS. JAROSLAW:  Very briefly, your Honor.  I do want to

24  say that Mr. Li couldn't have been more professional.  Mr. Li

25  did extend courtesies to my client and Mr. Li acted to the

1    highest standard of the profession, and we have nothing to

2    criticize about Mr. Li's handling of the case.  I won't go into

3    further detail than my letter, but I will say that what Mr. Li

4    characterizes as thuggish actions were in fact taken, as

5    alleged in the letter, by the law enforcement agents, and we in

6    no way hold Mr. Li responsible for that.

7         THE COURT:  Thank you very much.  I compliment both of

8    you on particularly your written submissions.  They were

9    thorough and thoughtful, and I indicated the reason that I look

10    favorably upon what is to be a formal application for

11    appointment under the Criminal Justice Act is particularly

12    those written submissions and the fact that you've come down

13    here today and did a good job.

14         All right.  The presentence report is dated May 29 of

15    this year.  The defendant absconded twice and he is still at

16    large, as we've indicated.  He's a 30-year old Australian.  The

17    details of his background in Australia and his prior criminal

18    record is mentioned briefly in the probation report.  He has

19    ten Australian convictions and apparently one in Great Britain.

20    And he had difficulties in France, which Ms. Jaroslaw seeks to

21    correct, because he wasn't detained in France, in her letter

22    replying to the government submission.

23         The presentence report was written before he absconded

24    and sent the email which I read from.  And the presentence

25    report completely fails, because it was before he absconded, to

1  take into consideration, in fixing the offense level and

2  guideline range, the fact that he did abscond and sent the

3  letter, the email that I mentioned.

4          The government's submission of September 9, 2020 sets

5  forth his fraudulent conduct in this case, which was extensive,

6  it involved a $500,000 check, and the need for restitution of

7  $116,692.73 to the victim of the criminal activity, which is

8  the Chase National Bank.  I signed an order of restitution.

9  The defendant absconded first on June 21st, then he absconded

10  again, and I read, as I said, from the email.

11          The defense submission of September 9 is very thorough

12  and seeks time served, as Ms. Jaroslaw said.  I also, with the

13  defense submission, received a letter from the defendant's

14  father and two friends in Australia.

15          The total offense level I find here pursuant -- well,

16  first of all, before getting to what I find to be the offense

17  level, in the probation report the offense level is set at 16,

18  and that incorporated a 12-point enhancement for the intended

19  loss, which I find to be $500,000, and there was a three-point

20  reduction for acceptance of responsibility.  That was in the

21  probation report before the absconding, and there was a

22  Criminal History Category of Roman Numeral I.  That made the

23  guideline range 21 to 27 months.

24          But then the second absconding occurred, and I believe

25  that he made false statements while on bail, and I think that

1  the government is correct when it urges a two-point enhancement

2  for obstruction of justice and that there should be no

3  three-point reduction for acceptance of responsibility.

4      Therefore, the total offense level I find to be 21,

5  and the Criminal History Category of Roman Numeral I, calls for

6  a range under the guidelines of 37 to 46 months.

7      Frankly, the defendant is a fraudster.  That is what

8  he seems to do more for a living than anything else.  I

9  seriously thought about giving him a sentence at the top of the

10  guidelines of 46 months, but I'm going to give a sentence of 37

11  months.  He's to be committed to the custody of the Attorney

12  General of the United States or the Attorney General's

13  authorized representative for the period of 37 months on this

14  case if he's ever apprehended.

15      He's to serve a period of five years supervised

16  release under the mandatory and standard conditions of

17  supervised release, plus the special conditions that are set

18  forth in the probation report at page 17, and those special

19  conditions are as follows:

20      He's to provide probation with access to any financial

21  information that they request.  He's not to incur any new open

22  lines of credit or charges without the approval of probation.

23  He's to obey the immigration laws and comply with the

24  directives of the immigration authorities.  If he's ever

25  apprehended, he's to be supervised by the district of residence

1    in the United States, and a $100 special assessment is fixed as

2    required by law.

3             I have ordered restitution of $116,692.73.  And if

4    he's ever apprehended, he's advised of his right to appeal.

5    That's the sentence of the Court.

6             Thank you, both counsel, for your attention to the

7    matter.  And I will receive the application from you next

8    Wednesday, Ms. Jaroslaw.

9             MS. JAROSLAW:  Yes, your Honor.  Two other things, I

10   have been instructed to file a notice of appeal, and on my own

11   application I ask to be relieved.

12            THE COURT:  You have been instructed to file a notice

13   of appeal?

14            MS. JAROSLAW:  Yes.

15            THE COURT:  Who instructed you?

16            MS. JAROSLAW:  My client.

17            THE COURT:  Well --

18            MS. JAROSLAW:  My intent is to file the notice, and

19   then I request that your Honor relieve me.

20            THE COURT:  The question of relieving, once an appeal

21   is filed, goes to the Court of Appeals, doesn't it?

22            MS. JAROSLAW:  I believe filing a notice is

23   protective; and by filing a notice, counsel does not

24   automatically become counsel on appeal.

25            THE COURT:  You are certainly relieved of

1  representation.  After I fix any remuneration for you under the

2  Criminal Justice Act, you're relieved in this Court.

3  MS. JAROSLAW:  Thank you.

4  THE COURT:  Thank you.

5  MR. LI:  Your Honor, one final application from the

6  government.  Just with respect to redaction from the public

7  transcript, there was reference made to █████████████████

8  ███████████, which is a sealed case pending before Judge Cote.

9  I would ask --

10  THE COURT:  That's in the written submission.

11  MR. LI:  No, in the discussion before the Court today.

12  THE COURT:  You mentioned ████████?

13  MR. LI:  The defense counsel mentioned that case.  So

14  I would ask that the name of that case, the docket number and

15  the name of the defendant, be redacted from the public version

16  of the transcript.

17  THE COURT:  The case is sealed, so ordered.

18  MR. LI:  Thank you, your Honor.

19  MS. JAROSLAW:  Thank you, your Honor.  And just to be

20  clear, the submissions by the defense will be filed under seal,

21  is that correct?

22  THE COURT:  No.

23  MS. JAROSLAW:  No?

24  THE COURT:  There's no reference to a particular

25  country.  No.  I said all bets were off when he absconded.  No,

K9GTTALS - REDACTED

1    that application is denied.

2              Thank you very much, both of you.

3              MR. LI:  Thank you, your Honor.

4              THE COURT:  Okay, thank you.

5              (Adjourned)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25